Application of Earl Caldwell and New York Times Company for an Order Quashing Grand Jury Subpoenas.

Earl CALDWELL, Appellant,

v.

UNITED STATES of America, Appellee.

No. 26025.

United States Court of Appeals, Ninth Circuit.

Nov. 16, 1970.

⊜⤳90

---

Anthony G. Amsterdam, Stanford, Cal. (argued); Chas. S. Ralston, San Francisco, Cal., and William B. Turner, NAACP Legal Defense, San Francisco, Cal., for appellant.

Sidney M. Glazer (argued), Victor C. Woerheide, Richard L. Darst, Criminal Division, U. S. Dept. of Justice, Washington, D. C.; James L. Browning, Jr. U. S. Atty., San Francisco, Cal. for appellee.

Melvin L. Wulf, Joel M. Gora, American Civil Liberties Union, New York City, Paul N. Halvonik, Charles C. Marson, ACLU, San Francisco, Cal; A. L. Wirin, Fred Okrand, Lawrence R. Sperber, ACLU, Los Angeles, Cal., Leo P. Larkin, Jr., Stanley Godofsky, John J. Sheehy, of Royall, Koegel & Wells, New York City, for The Washington Post Company and Newsweek, Inc., Irwin Karp, New Jersey, New Jersey, for Authors League of America, Inc.; John B. Bates, for New York Times; John Bates, of Pillsbury, Madison, & Sutro; Morris M. Doyle of McCutchen, Doyle, Brown & Enerson, San Francisco, Cal.; Alan J. Hruska of Cravath, Swaine & Moore, New York City; Rudolph Kass, of Brown, Rudnick, Freed & Gesmer, Boston, Mass; Stanley Godofsky of Royall, Koegel & Wells, New York City; Robert M. Dunne of Dunne, Phelps & Mills, San Francisco, Cal., for amici curiae.

Before MERRILL and ELY, Circuit Judges, and JAMESON, District Judge*

MERRILL, Circuit Judge:

Earl Caldwell appeals from an order holding him in contempt of court for disregard of an order directing him to appear before the Grand Jury of the United States District Court for the Northern District of California pursuant to a subpoena issued by the Grand Jury.

Appellant is a black news reporter for the New York Times. He has become a specialist in the reporting of news concerning the Black Panther Party. The Grand Jury is engaged in a general investigation of the Black Panthers and the possibility that they are engaged in criminal activities contrary to federal law.

In order to protect First Amendment interests asserted by appellant, the District Court order of attendance, which appellant disregarded, expressly granted appellant the privilege of silence as to certain matters until such time as the Government should demonstrate "a compelling and over-riding national interest in requiring Mr. Caldwell's testimony which cannot be served by any alternative means." This protective order provided:

"(1) That * * * he shall not be required to reveal confidential associations, sources or information received, developed or maintained by him as a professional journalist in the course of his efforts to gather news for dissemination to the public through the press or other news media.

---

* Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

(2) That specifically, without limiting paragraph (1), Mr. Caldwell shall not be required to answer questions concerning statements made to him or information given to him by members of the Black Panther Party unless such statements or information were given to him for publication or public disclosure.

(3) That, to assure the effectuation of this order, Mr. Caldwell shall be permitted to consult with his counsel at any time he wishes during the course of his appearance before the grand jury * * *."

Appellant contends that the privilege granted by the District Court will not suffice to protect the First Amendment interests at stake; that unless a specific need for his testimony can be shown by the United States he should be excused from attendance before the Grand Jury altogether. Thus it is not the scope of the interrogation to which he must submit that is here at issue; it is whether he need attend at all.

 The case is one of first impression and one in which news media have shown great interest and have accordingly favored us with briefs as amici curiae. As is true with many problems recently confronted by the courts, the case presents vital questions of public policy: questions as to how competing public interests shall be balanced. The issues require us to turn our attention to the underlying conflict between public interests and the nature of such competing interests.[1]

While the United States has not appealed from the grant of privilege by the District Court (which it opposed below) and the propriety of that grant is thus not directly involved here, appellant's contentions here rest upon the same First Amendment foundation as did the protective order granted below. Thus, before we can decide whether the First Amendment requires more than a protective order delimiting the scope of interrogation, we must first decide whether it requires any privilege at all.

## THE PROTECTIVE ORDER

The proceedings below were initiated by a motion by appellant to quash subpoenas issued by the Grand Jury.[2] In

---

1. Where, as here, the alleged abridgement of First Amendment interests occurs as a by-product of otherwise permissible governmental action not directed at the regulation of speech or press, "resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." Barenblatt v. United States. 360 U.S. 109, 126, 79 S.Ct. 1081, 1093, 3 L.Ed.2d 1115 (1959); see, e. g., Konigsberg v. State Bar of Cal., 366 U.S. 36, 50–51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); NAACP v. Alabama ex rel. Pattersen, 357 U.S. 449, 460–467, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Kalven, "The New York Times Case: A Note on 'The Central Meaning of the First Amendment,'" 1964. Sup.Ct.Rev. 191, 214–16 (1964).

2. The first subpoena was served February 2, 1970. It directed appellant to appear and testify and to bring with him notes and tape recordings of interviews reflecting statements made for publication by officers and spokesmen for the Black Panther Party concerning the aims, purposes and activities of the organization. On March 16, after appellant had protested the scope of the subpoena, a second subpoena was served. It simply required appellant's attendance. Appellant's motion to quash was directed to both subpoenas. The court denied the motion and directed compliance with the March 16 subpoena subject to the protective order. 311 F.Supp. 358. Appellant appealed that decision; but the appeal was dismissed, apparently on the ground that the District Court order was not appealable. By the term of the Grand Jury had expired, and a new Grand Jury was sworn. A new subpoena ad testificandum was served on May 22, 1970. All proceedings had in connection with the earlier subpoenas were made a part of the record of the proceedings concerning this last subpoena. A new order directing attendance was issued; this order also contained the protective provisions or privilege. It is appellant's disregard of that order which resulted in the judgment of contempt now before us.

his moving papers appellant's position was that the "inevitable effect of the subpoenas will be to suppress vital First Amendment freedoms of Mr. Caldwell, of the New York Times, of the news media, and of militant political groups by driving a wedge of distrust and silence between the news media and the militants, and that this Court should not countenance a use of its process entailing so drastic an incursion upon First Amendment freedoms in the absence of compelling governmental interest—not shown here—in requiring Mr. Caldwell's appearance before the Grand Jury."

Amici curiae solidly supported appellant in this position. The fact that the subpoenas would have a "chilling effect" on First Amendment freedoms was impressively asserted in affidavits of newsmen of recognized stature, to a considerable extent based upon recited experience. Appellant's own history is related in his moving papers:

"Earl Caldwell has been covering the Panthers almost since the Party's beginnings. Initially received hesitatingly and with caution, he has gradually won the confidence and trust of Party leaders and rank-and-file members. As a result, Panthers will now discuss Party views and activities freely with Mr. Caldwell. * * * Their confidences have enabled him to write informed and balanced stories concerning the Black Panther Party which are unavailable to most other newsmen.

* * * * * *

If Mr. Caldwell were to disclose Black Panther confidences to governmental officials, the grand jury, or any other person, he would thereby destroy the relationship of trust which he presently enjoys with the Panthers and other militant groups. They would refuse to speak to him; they would become even more reluctant than they are now to speak to any newsmen; and the news media would thereby be vitally hampered in their ability to cover the views and activities of the militants."

The response of the United States disputed the contention that First Amendment freedoms were endangered.

"Newsmen filing affidavits herein allege that they fear, in effect, that the Black Panthers will refrain from furnishing them with news. This contention is specious. Despite some assertions by Black Panther leaders to the contrary, the Black Panthers in fact depend on the mass media for their constant endeavor to maintain themselves in the public eye and thus gain adherents and continued support. They have continued unceasingly to exploit the facilities of the mass media for their own purposes."

■ Assuming, arguendo, that this statement is correct, it is not fully responsive to the claim that First Amendment freedoms are endangered. The premise underlying the Government's statement is that First Amendment interests in this area are adequately safeguarded as long as potential news makers do not cease using the media as vehicles for their communication with the public. But the First Amendment means more than that. It exists to preserve an "untrammeled press as a vital source of public information," Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). Its objective is the maximization of the "spectrum of available knowledge," Griswold v. Connecticut, 381 U.S. 479, 482, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Thus, it is not enough that Black Panther press releases and public addresses by Panther leaders may continue unabated in the wake of subpoenas such as the one here in question. It is not enough that the public's knowledge of groups such as the Black Panthers should be confined to their deliberate public pronouncements or distant news accounts of their occasional dramatic forays into the public view.

■ The need for an untrammeled press takes on special urgency in times of widespread protest and dissent. In such times the First Amendment protec-

tions exist to maintain communication with dissenting groups and to provide the public with a wide range of information about the nature of protest and heterodoxy. See, e. g., Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); Thornhill v. Alabama, 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

The affidavits contained in this record required the conclusion of the District Court that "compelled disclosure of information received by a journalist within the scope of such confidential relationships jeopardizes those relationships and thereby impairs the journalist's ability to gather, analyse, and publish the news."

Accordingly we agree with the District Court that First Amendment freedoms are here in jeopardy.

On the other side of the balance is the scope of the Grand Jury's investigative power.

In his moving papers appellant complained that the Government had not disclosed the subject, direction or scope of the Grand Jury inquiry and that efforts of counsel to obtain some specification had been unavailing.

"Government counsel has said only that the grand jury has 'broad investigative powers,' that he cannot 'limit the inquiry of the grand jury in advance,' and that the subject and scope of the grand jury's investigation is 'no concern of a subpoenaed witness.'"

The Government in opposing appellant's motion to quash, stated its position in these terms:

"On the basis of what he has written, directly quoting statements made to him for publication by spokesmen for the Black Panther Party, Earl Caldwell obviously can give and should come forward with evidence which will be helpful to the Grand Jury in its inquiry."

Thus, as is true in innumerable instances, the Grand Jury does not know what it wants from this witness. It wants to find out what he knows that might shed light on the general problem it is investigating. This type of wideranging, open-ended inquiry is, of course, typical of many Grand Jury proceedings. See Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); Note, "The Grand Jury as an Investigatory Body," 74 Harv.L.Rev. 590, 591–92 (1961). If the privilege of silence as defined by the District Court is made available to news gatherers, the Grand Jury will be deprived of their assistance as witnesses in such general investigations.

The question posed below was whether, as a matter of law, this loss to the Grand Jury, this impediment to its traditionally broad scope of inquiry, outweighs the injury to First Amendment freedoms.

The Government stresses the historic traditions of the Grand Jury with its extensive powers of investigation, see, e. g., Hale v. Henkel, *supra*, and the corresponding duty of the citizenry to come before the Grand Jury to give testimony. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). But these general propositions of Government authority necessarily are tempered by constitutional prohibitions and other exceptional circumstances. See United States v. Bryan, *supra,* 339 U.S. at 331, 70 S.Ct. 724, 94 L.Ed. 884; Blair v. United States, *supra,* 250 U.S. at 281–282, 39 S.Ct. 468, 63 L.Ed. 979. In this respect we find guidance in the Supreme Court decisions regarding conflicts between First Amendment interests and legislative investigatory needs;[3] the Court has required the sacrifice of First Amendment freedoms only where a compelling

---

3. Like the Grand Jury, legislative committees have long been viewed as invaluable instruments of governance. See, e. g., Barenblatt v. United States, 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); United States v. Rumely, 345 U.S. 41, 43, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

need for the particular testimony in question is demonstrated.[4]

If the Grand Jury may require appellant to make available to it information obtained by him in his capacity as news gatherer, then the Grand Jury and the Department of Justice have the power to appropriate appellant's investigative efforts to their own behalf—to convert him after the fact into an investigative agent of the Government. The very concept of a free press requires that the news media be accorded a measure of autonomy; that they should be free to pursue their own investigations to their own ends without fear of governmental interference; and that they should be able to protect their investigative processes. To convert news gatherers into Department of Justice investigators is to invade the autonomy of the press by imposing a governmental function upon them. To do so where the result is to diminish their future capacity as news gatherers is destructive of their public function.[5] To accomplish this where it has not been shown to be essential to the Grand Jury inquiry simply cannot be justified in the public interest.

■ Further it is not unreasonable to expect journalists everywhere to temper their reporting so as to reduce the probability that they will be required to submit to interrogation. The First Amendment guards against governmental action that induces such self-censorship. See New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

It was on such considerations as these that the balance was struck by the District Court. It ruled:

"When the exercise of the grand jury power of testimonial compulsion so necessary to the effective functioning of the court may impinge upon or repress First Amendment rights or freedom of speech, press and association, which centuries of experience have found to be indispensable to the survival of a free society, such power shall not be exercised in a manner likely to do so until there has been a clear showing of a compelling and overriding national interest that cannot be served by any alternative means."

Finding that the Government had shown no compelling or overriding national interest for testimony of the sort specified, the District Court imposed the limits we have set forth earlier in this opinion. It reserved jurisdiction to modify its order on a showing of such governmental interest which cannot be served by means other than by appellant's testimony.

■ We agree with the District Court that the First Amendment requires this qualified privilege, and we find nothing unreasonable in the terms in which it was there defined.[6]

4. DeGregory v. Attorney General of New Hampshire, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); NAACP v. Alabama. 357 U.S. 449, 460–467, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958); Sweezy v. New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953). It is necessary that, as the investigation proceeds, step-by-step, "an adequate foundation for inquiry must be laid." Gibson v. Florida Legislative Investigation Committee, supra, 372 U.S. at 557, 83 S.Ct. at 899.

5. It is a paradox of the Government's position that, if groups like the Black Panthers cease taking reporters like appellant into their confidence, these journalists will, in the future, be unable to serve a public function either as news gatherers or as prosecution witnesses.

6. Garland v. Torre, 259 F.2d 545 (2d Cir.) cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958), is not to the contrary. That case involved a libel suit in which an author attributed alleged defamatory remarks reported by her to a "network executive." The author, when

## ATTENDANCE

As we have noted, the issue upon this appeal goes beyond the question of a privilege to decline to respond to interrogation in certain areas. The District Court ruled that, although protected by its limited privilege, Caldwell was required to respond to the subpoena by appearing before the Grand Jury to answer questions not privileged. Appellant contends that his mere appearance before the Grand Jury will result in loss of his news sources. The Government questions this result.

The affidavits on file cast considerable light on the process of gathering news about militant organizations.[7] It is apparent that the relationship which

called as a witness in the libel action against the network, claimed a First Amendment privilege not to disclose the informant's identity and was held in contempt for her refusal to divulge the source.

The Second Circuit (per Judge, now Mr. Justice, Stewart) affirmed the judgment of contempt. But, in doing so, it accepted the proposition "that compulsory disclosure of confidential sources of information may entail an abridgement of press freedom * * *" Id., at 548. The test was "whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom," Id. In that case the court noted that it was "not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news nor with a case where the identity of the news source is of doubtful relevance or materiality." Id., at 549–550. There the information was essential for the trial of plaintiff's case; "the question asked of appellant went to the heart of plaintiff's claim." Id. Thus an over-riding need for the specific testimony was shown.

7. One reporter for the New York Times states: "[O]n every story there is a much subtler and much more important form of communication at work between a reporter and his sources. It is built up over a period of time working with and writing about an organization, a person, or a group of persons. The reporter and the source each develops a feeling for what the other will do. The reporter senses how far he can go in writing before the source will stop communicating with him. The source, on the other hand, senses how much he can talk and act freely before he has to close off his presence and his information from the reporter. It is often through such subtle communication that the best and truest stories are written and printed in The Times, or any other newspaper."

Appellant relates his own experiences as follows:

"I began covering and writing articles about the Black Panthers almost from the time of their inception, and I myself found that in those first months that they were very brief and reluctant to discuss any substantive matter with me. However, as they realized I could be trusted and that my sole purpose was to collect my information and present it objectively in the newspaper and that I had no other motive, I found that not only were the party leaders available for in-depth interviews but also the rank and file members were cooperative in aiding me in the newspaper stories that I wanted to do. During the time that I have been covering the party, I have noticed other newspapermen representing legitimate organizations in the news media being turned away because they were not known and trusted by the party leadership.

As a result of the relationship that I have developed, I have been able to write lengthy stories about the Panthers that have appeared in The New York Times and have been of such a nature that other reporters who have not known the Panthers have not been able to write. Many of these stories have appeared in up to 50 or 60 other newspapers around the country.

The Black Panther Party's method of operation with regard to members of the press is significantly different from that of other organizations. For instance, press credentials are not recognized as being of any significance. In addition, interviews are not normally designated as being 'backgrounders' or 'off the record' or 'for publication' or 'on the record.' Because no substantive interviews are given until a relationship of trust and confidence is developed between the Black Panther Party members and reporter, statements are rarely made to such reporters on an expressed 'on' or 'off' the record basis. Instead, an understanding is developed over a period of

an effective privilege in this area must protect is a very tenuous and unstable one. Unlike the relation between an attorney and his client or a physician and his patient, the relationships between journalists and news sources like the Black Panthers are not rooted in any service the journalist can provide his informant apart from the publication of the information so obtained. Goldstein, "Newsmen and their Confidential Sources," The New Republic 13 (March 21, 1970). The relationship depends upon a trust and confidence that is constantly subject to reexamination and that depends in turn on actual knowledge of how news and information imparted have been handled and on continuing reassurance that the handling has been discreet.[8]

This reassurance disappears when the reporter is called to testify behind closed doors. The secrecy that surrounds Grand Jury testimony necessarily introduces uncertainty in the minds of those who fear a betrayal of their confidences. These uncertainties are compounded by the subtle nature of the journalist-informer relation. The demarcation between what is confidential and what is for publication is not sharply drawn and often depends upon the particular context or timing of the use of the information. Militant groups might very understandably fear that, under the pressure of examination before a Grand Jury, the

witness may fail to protect their confidences with quite the same sure judgment he invokes in the normal course of his professional work.

The Government characterizes this anticipated loss of communication as Black Panther reprisal; as manifesting a Black Panther demand that, "if you subpoena Caldwell, we will never speak to you again." It argues that it is unthinkable that the American people would capitulate to such extortion.

But it is not an extortionate threat we face. It is human reaction as reasonable to expect as that a client will leave his lawyer when his confidence is shaken. The news source has placed no price tag or exaction on enjoyment of First Amendment freedoms save its continuing confidence in the discretion of the reporter.[9]

As the Government points out, loss of such a sensitive news source can also result from its reaction to indiscreet or unfavorable reporting or from a reporter's association with Government agents or persons disapproved of by the news source. Loss in such a case, however, results from an exercise of the choice and prerogative of a free press. It is not the result of Government compulsion.

We conclude that the privilege not to answer certain questions does not, by itself, adequately protect the First Amendment freedoms at stake in this

time between the Black Panther Party members and the reporter as to matters which the Black Panther Party wishes to disclose for publication and those matters which are given in confidence."

He concludes:

" * * * if I am forced to appear in secret grand jury proceedings, my appearance alone would be interpreted by the Black Panthers and other dissident groups as a possible disclosure of confidences and trusts and would similarly destroy my effectiveness as a newspaperman."

A fellow black reporter, on leave of absence from The New York Times, states:

"From my experience, I am certain that a black reporter called upon to tes-

tify about black activist groups will lose his credibility in the black community generally. His testifying will also make it more difficult for other reporters to cover that community. The net result, therefore, will be to diminish seriously the meaningful news available about an important segment of our population."

8. This is not necessarily true of every news source. In political and diplomatic areas where the source is an undercover tipster the relationship may well be sufficiently protected by a privilege not to disclose the source.

9. Quite a different situation would be presented were the demand unrelated to the privileged relationship: E. g. "The police must free our leader."

area; that without implementation in the manner sought by appellant the privilege would fail in its very purpose.

On the other side of the balance is the Grand Jury's right to summon this witness before it and in secrecy compel him to answer questions or to resort to his privilege. It is not the right to secure appearance and testimony that is itself in issue; the District Court's protective order alone would suffice were that all. It is the right to compel presence at a secret interrogation with which we are concerned.

Throughout history secret interrogation has posed problems and caused unease. See, e. g., Note, "An Historical Argument for the Right to Counsel During Police Interrogation," 73 Yale L.J. 1000, 1034–45 (1964). We do not doubt that secret interrogation is in general essential to the integrity and effectiveness of the Grand Jury process. However, implicit in the extraordinary nature of secret interrogations, is the possibility of conflict with basic rights. When this is shown to occur it is appropriate to inquire into the need in the particular case for the specific incursion. Since compulsion to attend and testify entails the exercise of judicial process, it is appropriate that the inquiry be judicially entertained.

The question, then, is whether the injury to First Amendment liberties which mere attendance threatens can be justified by the demonstrated need of the Government for appellant's testimony as to those subjects not already protected by the privilege.

Appellant asserted in affidavit that there is nothing to which he could testify (beyond that which he has already made public and for which, therefore, his appearance is unnecessary) that is not protected by the District Court's order.

If this is true—and the Government apparently has not believed it necessary to dispute it—appellant's response to the subpoena would be a barren performance —one of no benefit to the Grand Jury. To destroy appellant's capacity as news gatherer for such a return hardly makes sense. Since the cost to the public of excusing his attendance is so slight, it may be said that there is here no public interest of real substance in competition with the First Amendment freedoms that are jeopardized.

If any competing public interest is ever to arise in a case such as this (where First Amendment liberties are threatened by mere appearance at a Grand Jury investigation) it will be on an occasion in which the witness, armed with his privilege, can still serve a useful purpose before the Grand Jury. Considering the scope of the privilege embodied in the protective order, these occasions would seem to be unusual. It is not asking too much of the Government to show that such an occasion is presented here.

 In light of these considerations we hold that where it has been shown that the public's First Amendment right to be informed would be jeopardized by requiring a journalist to submit to secret Grand Jury interrogation, the Government must respond by demonstrating a compelling need for the witness's presence before judicial process properly can issue to require attendance.

We go no further than to announce this general rule. As we noted at the outset, this is a case of first impression. The courts can learn much about the problems in this area as they gain more experience in dealing with them. For the present we lack the omniscience to spell out the details of the Government's burden[10] or the type of proceeding that

---

10. Appellant, in his brief to this court, has carefully spelled out what he feels would be required:

"Specifically, we contend that, before it may compel a newsman to appear in grand jury proceedings under circumstances that would seriously damage the news-gathering and reporting abilities of the press, the Government must show at least: (1) that there are reasonable

would accommodate efforts to meet that burden.[11] The fashioning of specific rules and procedures appropriate to the particular case can better be left to the District Court under its retained jurisdiction. Cf., White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L. Ed.2d 738 (1963).

Finally we wish to emphasize what must already be clear: the rule of this case is a narrow one. It is not every news source that is as sensitive as the Black Panther Party has been shown to be respecting the performance of the "establishment" press or the extent to which that performance is open to view. It is not every reporter who so uniquely enjoys the trust and confidence of his sensitive news source.

## THE FOURTH AMENDMENT ISSUE

Appellant also moved to quash the Grand Jury subpoenas on the ground that they were based upon information obtained by unconstitutional surveillance of his interviews with Black Panther members. He sought a hearing to determine whether the subpoenas were so obtained. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The District Court denied the motion solely on the ground that appellant lacked standing to raise the Fourth Amendment contention. This is assigned as error.

In light of our disposition of the First Amendment question in this case, we need not reach this issue. The United States might never meet the First Amendment burden imposed upon it by the District Court order as here implemented. Even if the Government does meet that burden, the court may not have to reach this Fourth Amendment claim; the Government's showing of need for appellant's testimony may disclose a basis for the Government's information which would present no Fourth Amendment problem. If such a problem is presented it could then be discussed in light of the specific facts.

Accordingly, we regard decision upon this question as unnecessary to the present disposition of the case. We reserve the issue and decline to reach it here.

Reversed and remanded with instructions that the judgment of contempt and the order directing attendance before the Grand Jury be vacated. The District Court under its retained jurisdiction may entertain such further proceedings as may be initiated by the United States.

JAMESON, District Judge (concurring):

This case presents narrow issues in the "delicate and difficult" task of reconciling the First Amendment guarantee of freedom of the press with the fair administration of justice, including the broad investigatory power of a grand jury and the obligation of a witness to testify. While perhaps unnecessary for a determination of this appeal, it is helpful, in my opinion, to note the guidelines for resolving conflicts in this sensitive area, as summarized by Judge, now

---

grounds to believe the journalist has information. (2) specifically relevant to an identified episode that the grand jury has some factual basis for investigating as a possible violation of designated criminal statutes within its jurisdiction, and (3) that the Government has no alternative sources of the same or equivalent information whose use would not entail an equal degree of incursion upon First Amendment freedoms. Once this minimal showing has been made, it remains for the courts to weigh the precise degree of investigative need that thus appears

against the demonstrated degree of harm to First Amendment interests involved in compelling the journalist's testimony." While there is much to commend this suggestion, we are not certain that it represents the best or most satisfactory formulation of the requirement. See, for example, People v. Dohrn, et al., Circuit Court of Cook County, Criminal Division, No. 69-3808, May 20. 1970.

11. Appellant suggests that the Government's specification of need could be presented *in camera* to the District Court with appellant or his counsel present.

Mr. Justice, Stewart, in Garland v. Torre, 259 F.2d 545, 548–549 (2d Cir.) cert. denied 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958):

"But freedom of the press, precious and vital though it is to a free society, is not an absolute. What must be determined is whether the interest to be served by compelling the testimony of the witness in the present case justifies some impairment of this First Amendment freedom. That kind of determination often presents a 'delicate and difficult' task. (Citing cases). * * *

"* * * Freedom of the press, hard-won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press.

"It would be a needless exercise in pedantry to review here the historic development of that duty. Suffice it to state that at the foundation of the Republic the obligation of a witness to testify and the correlative right of a litigant to enlist judicial compulsion of testimony were recognized as incidents of the judicial power of the United States. (Citing cases). * * *

"Without question, the exaction of this duty impinges sometimes, if not always, upon the First Amendment freedoms of the witness. Material sacrifice and the invasion of personal privacy are implicit in its performance. The freedom to choose whether to speak or be silent disappears. * * *

"If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the Constitution to a paramount public interest in the fair administration of justice. * * *."

As stated in the court's opinion (note 6) Garland v. Torre was a civil action for libel.[1] The obligation to appear and testify is even stronger and the scope of inquiry is broader in grand jury investigations.[2]

The First Amendment rights of appellant were recognized fully by Judge Zirpoli in providing for the protective order discussed in the court's opinion. While not conceding the validity or propriety of the qualified privilege granted appellant, the Government did not seek review of that order on this appeal.[3]

---

1. As Judge Merrill's opinion notes, Garland v. Torre did not involve the "use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news nor with a case where the identity of the news source is of doubtful relevance or materiality."

2. In distinguishing between investigations by a grand jury and those conducted by commissions created by Congress, Mr. Justice Douglas noted that the grand jury is the "only accusatory body in the Federal Government that is recognized by the Constitution," and that "[I]t has broad investigational powers to look into what may be offensive against federal criminal law." Dissenting opinion in Hannah v. Larche, 363 U.S. 420, 499, 80 S.Ct. 1502, 1549, 4 L.Ed.2d 1307 (1960).

3. At oral argument counsel for the Government submitted a press release from the Attorney General setting forth new Department of Justice guidelines for subpoenas to the news media, in which it is expressly recognized that the "Department does not approve of utilizing the press as a spring board for investigations", and which provide, inter alia, that, "[T]here should be sufficient reason to believe that the information sought is essential to a successful investigation—particularly with reference to directly establishing guilt or innocence"; that "[T]he government should have unsuccessfully attempted to obtain the information from alternative non-press sources"; that subpoenas "should normally be limited to the verification of published information and to such surroundinig circumstances as relate to the accuracy of the published information"; and that "subpoenas should, wherever possible, be directed at

The order entered by the district court is adequate to protect any unnecessary impingement of First Amendment rights *after* the appearance of the witness before the grand jury. Accordingly we are concerned with the narrow question of whether the Government's showing of a "compelling and overriding national interest that cannot be served by any alternative means" may be required in advance of the issuance of a subpoena.

Appellant did not have any express constitutional right to decline to appear before the grand jury. This is a duty required of all citizens. Nor has Congress enacted legislation to accord any type of privilege to a news reporter.[4] In my opinion the order of the district court could properly be affirmed, and this would accord with the customary procedure of requiring a witness to seek a protective order after appearing before the grand jury. I have concluded, however, that Judge Merrill's opinion properly holds that the same result may be achieved by requiring the Government to demonstrate the compelling need for the witness's presence prior to the issuance of a subpoena and in this manner avoid any unnecessary impingement of First Amendment rights.

As Judge Merrill has suggested, this is a case of first impression. It would seem that the district court could develop procedures which would not unduly hamper or interfere with the investigatory powers of the grand jury. The Government would have the same burden, except that it would make its showing at a hearing in advance of the issuance of subpoenas rather than after the witness appears and seeks a protective order.

---

material information regarding a limited subject matter, should cover a reasonably limited period of time, and should avoid requiring production of a large volume of unpublished material." John N. Mitchell, "Free Press and Fair Trial: The Subpoena Controversy," an address before House of Delegates, American Bar Association. (August 10, 1970).

4. Several states have enacted legislation granting qualified privileges to newsmen.