In the Matter of a Grand Jury Subpoena
Served Upon Arthur KINOY.

No. M–11–188.

United States District Court,
S. D. New York.

Dec. 28, 1970.

See also D.C., 326 F.Supp. 407.

Whitney North Seymour, Jr., U. S. 'Atty., S. D. N. Y., for the United States; John H. Doyle, III, Asst. U. S. Atty., of counsel.

William J. Bender, William C. Cunningham, William M. Kunstler, Doris Peterson, James Reif, Morton Stavis, Nancy Stearns, Peter Weiss, Center for Constitutional Rights, John Lowenthal, Melvin Wulf, Norman Dorsen, American Civil Liberties Union, Jeremiah Gutman, Ann Garfinkle, Helene E. Schwartz, Victor Rabinowitz, Emergency Civil Liberties Committee, Eric Seitz, National Lawyers Guild, New York City, for Arthur Kinoy.

## OPINION

FRANKEL, District Judge.

Arthur Kinoy is a well-known practitioner and professor of law. He has been subpoenaed to appear before a grand jury inquiring into possible violations of 18 U.S.C. § 1071, which proscribes concealment of persons subject to arrest warrants or similar process.[1] He says, and the United States Attorney confirms, that the grand jury seeks to question him concerning the whereabouts of his daughter Joanne, who, according to government counsel, "is known to have been closely acquainted with an individual believed upon reliable information to have recently harbored and concealed from arrest a fugitive defendant named in a pending indictment in this District."[2] Mr. Kinoy moves to quash the subpoena contending for a variety of reasons that he may not lawfully be required to appear before the grand jury. This is, of course, an extreme position; with the rarest of possible exceptions, nobody is immune from such appearances whether or not particular questions put by the grand jury to the witness who has appeared may give rise to valid claims of privilege. Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 63 L.Ed. 979 (1919); United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950); cf. United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968). Having examined Mr. Kinoy's extraordinary claim, the court concludes that it cannot be sustained.

1. Mr. Kinoy points out, and the court is aware, that he has performed notable service for various individuals and groups seeking enforcement of federal civil rights or espousing departures from political orthodoxy. Because of this, he says, invoking the recent decision of the Ninth Circuit in Caldwell v. United States, 434 F.2d 1081 (1970), cert. granted 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed. 2d 109, his very appearance before a grand jury will have a "chilling effect" upon First Amendment rights in that "it will cause these groups to lose confidence" in him "whether or not [he] is actually forced to betray legal confidences."[3] This breaks a long bow. The Caldwell case, reaching borders still to be tested, concerns the special situation of a journalist with unique access to the Black Panther Party, where the journalist was subpoenaed before a grand jury "engaged in a general investigation of the Black Panthers and the possibility that they are engaged in criminal activities contrary to federal law." 434 F.2d

1. "Whoever harbors or conceals any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States, so as to prevent his discovery and arrest, after notice or knowledge of the fact that a warrant or process has been issued for the apprehension of such person, shall be fined not more than $1,000 or imprisoned not more than one year, or both; except that if the warrant or process issued on a charge of felony, or after conviction of such person of any offense, the punishment shall be a fine of not more than $5,000, or imprisonment for not more than five years, or both."

2. Affidavit of Assistant United States Attorney John H. Doyle, III, sworn December 21, 1970, par. 2.

3. Memorandum of Law, p. 7.

at 1082. The Ninth Circuit, when it held *Caldwell* entitled not to appear before the grand jury, limited its result sharply to cases like that of the journalist before it, cautioning that cases of other journalists, affecting groups other than the Black Panthers, could well call for different treatment. *Id.* at 1090.

■ The distinctions between that case and this one are patent. Unlike the journalist, Mr. Kinoy as an attorney is not merely permitted, but bound, to preserve confidences of his clients, before the grand jury and elsewhere. Nothing in the First Amendment and nothing shown here indicates a need for totally immunizing him against grand jury subpoenas.

■ Mr. Kinoy and attorneys associated with him have filed reply affidavits (and have offered to supplement these with live testimony) attesting that their "unpopular clients" rely heavily upon counsel to safeguard their confidential communications. But this has been thought generally to be the way with clients, even popular ones, and the attorney-client privilege embodies the thought. Lawyers, of all people, should be supposed competent to enforce in the grand jury room their legitimate duties of confidentiality. They are obliged at the same time, not less than others, to give their non-privileged knowledge to the grand jury.

If lawyers for unpopular groups are automatically exempted from grand jury appearances, logic could compel far more sweeping, and intolerable, exemptions. Anyone who is not a lawyer, but has learned confidential things from such organizations, would presumably cause "chills" when he went before the grand jury. The concern would have more solid basis than it has here because the non-lawyer could not normally invoke a privilege to protect his informants. But there is no right on that basis not to appear, and Mr. Kinoy's case in this respect is no better than that of anyone else.

It is not to be questioned, of course, that any kind of exertion of governmental power against people or groups exercising First Amendment freedoms could exceed the limits of constitutionality. This could be true of regulation in the labor-management field, cf., Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); National Labor Relations Board v. Virginia Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); or of the taxing power, cf., Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); and it could undoubtedly turn out to be the case if the powers of grand juries were perverted or carried to excess. This does not imply, however, that groups, even unpopular groups, exercising First Amendment rights are totally exempt from government action. There has been a number of cases where the power of investigatory agencies has been limited because of the effects on First Amendment freedoms, see, e. g., Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); cf., N. A. A. C. P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Giving the fullest possible reading to what Mr. Kinoy says and offers to prove about a "chilling effect" in this case, the relation between the grand jury investigation and the infringement of First Amendment rights is so tangential and indirect that it cannot possibly justify forbidding the grand jury from even calling Mr. Kinoy as a witness. The investigation of the grand jury is designed to elicit from this witness narrow and clearly defined information, relating to a specific violation of law, from a person likely to have the information, and in circumstances where "less drastic" means for producing it have failed.

Finally, before leaving the broad First Amendment contentions presented in this case, it is fitting to observe that they have a quality of uncomfortable abstractness and unreality considering the specific circumstances involved. All are agreed that the only inquiry the grand

jury wishes to make of Mr. Kinoy is as to where his daughter can now be found. As noted below, this may raise some questions (here decided adversely to Mr. Kinoy) concerning his asserted role as lawyer for his child. Apart from those questions, however, this is an odd context in which to test the limits of the theory announced in Caldwell v. United States, *supra*. Whatever concerns may inhere in the activities and relationships of groups and organizations in their dealings with attorneys, they are scarcely illuminated by the narrow facts of the present contest concerning a man and his daughter.

2. Mr. Kinoy says he cannot be asked about his daughter because he is her lawyer as well as her parent, so that the attorney-client privilege bars compelling his appearance. His papers in support of this contention are remarkably vague and insufficient. He recalls that he told F.B.I. agents who questioned him:

"that my daughter Joanne was a client of mine as well as my child and that I would not answer any questions concerning her as her lawyer." [4]

Later on, he remembers saying about the same thing once more:

"In my office, they repeated essentially what had been said on the first visit. In turn, I repeated my statement that I was Joanne's lawyer as well as her father and that it was not proper or permissible for me, as an attorney, to discuss anything concerning a client with the FBI, particularly since they had informed me that a criminal investigation was in progress." [5]

But it is familiar law of course, not questioned by Mr. Kinoy or his array of counsel in this proceeding, that not everything asked of a lawyer about his client is privileged, and that not everyone so styled by a lawyer is a "client." See, e. g., Colton v. United States, 306 F.2d 633, 636–37, 638 (2d Cir. 1962); United States v. United Shoe Mach. Corp., 89 F.Supp. 357 (D.Mass.1950); McCormick on Evidence §§ 92, 95. And when a father is being asked where his daughter is, it is by no means self-evident that his knowledge on that subject comes to him via a privileged communication rather than in his role as parent. (It is assumed, of course, for the present subject that a non-lawyer father would have to answer the question. But compare Mr. Kinoy's claim of a parent-child privilege, considered below.)

When the court observed upon oral argument of the motion to quash that Mr. Kinoy's papers failed on their face to state a valid claim of attorney-client privilege, his counsel asked leave to supply the missing foundation by putting Mr. Kinoy then and there on the witness stand. The court questioned the propriety of this, where the motion had been made on a thick sheaf of papers and the effect of this extended proceeding was (and is) to postpone entirely the mere appearance of the subpoenaed witness before the grand jury. Nevertheless, all things considered, and with the consent of the Assistant United States Attorney, the court heard Mr. Kinoy's sworn testimony.

The testimony has not served to vindicate the claim of attorney-client privilege.[6] Mr. Kinoy's direct testimony was no more than a repetition of the generalities found in his affidavit. Pressed by government counsel and the court for some particulars, he did not notably improve the record. He was asked on cross for any "facts" he could give "on which the Court may infer that your daughter would not have disclosed her whereabouts were it not for the attorney-client rela-

---

4. Affidavit sworn December 17, 1970, par. 2.

5. *Id.*, par. 4.

6. That the burden is upon the claimant of the privilege, at least to the extent of "going forward with evidence" peculiarly known to him, see, e. g., United States v. Kovel, 296 F.2d 918, 923 (2d Cir. 1961); In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965).

tionship * * *." His response (Tr. 27–28):

"My assertion as an attorney at law, because I firmly believe and deeply believe that when an attorney at law makes a representation that a given individual is the client, that there is a prima facie assumption that that attorney at law is asserted as an officer of the court, a fact which the court should accept.

"I have asserted under oath that I have advised my daughter on numerous occasions. His Honor said from the bench that he gave legal advice to his children from time to time. And I would call, if I ever had that opportunity, hundreds and hundreds of members of the bar throughout the country who have the same experience with their children. And if we are required to break that confidence, then there is no sanctity of the attorney-client privilege."

Understandably dissatisfied with that answer, government counsel pursued the subject:

"Q Can you state one single fact on which this Court could reach the conclusion were it not for your representation of your daughter in certain legal matters, that she would have failed and refused to disclose her whereabouts to you?

*   *   *   *   *   *

"A That would destory [sic] the whole basis of the privilege. There is a whole body of law on the question of the privilege and self-incrimination."

Elsewhere, Mr. Kinoy continued to confuse the attorney-client privilege with other things; continued to stand on the mistaken view that his ipse dixit as a member of the bar was enough, cf. In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965); and failed in sum to show any factual basis for the conclusion that his knowledge of his daughter's whereabouts stems from a privileged communication.

The court attempted to make certain that the claim of privilege should not be lost by inadvertent failure to show facts, if they existed, to sustain it. Mr. Kinoy was asked (Tr. 36) "to tell us how a report of [his daughter's] whereabouts was in [his] judgment necessary to [his] rendering of legal advice * * *." He responded initially that the privilege precluded any answer to that. When told that he need not answer, but being reminded that the court was likely on the existing record to find no factual basis for the claim of privilege, he consulted with his several lawyers and proceeded thereafter to answer at some length.[7] He talked generally about his daughter's "political struggles" over the years, about her First Amendment rights, and about the dangers to her "of prosecution under vague and overly-broad statutes, both federal and state." He pointed out that the "act of traveling" is itself a potentially incriminating fact under 18 U.S.C. §§ 2101 and 2102. He noted that this creates problems for a civil rights and civil liberties lawyer in dealing with "his or her clients." He observed that disclosures of clients' whereabouts "would create a chilling effect on the ability of the attorney to function and upon the ability of the clients to exercise their rights under the first amendment." He indicated that these broadly defined areas outlined the nature of his attorney-client relationship with his daughter and the privileged character of her telling him where she is.

■ This aspect of the testimony has seeming weight; it might, if it stood alone, outline a plausible basis for the claim of attorney-client privilege. Moreover, the court does not deem it necessary that a lawyer state a meticulously accurate technical case for the privilege in order to safeguard the

7. The court may well have been mistaken in allowing the witness to choose whether to answer; "a witness claiming the attorney-client privilege may not refuse to disclose to the judge the circumstances into which the judge must inquire in order to rule on the claim." United States v. Kovel, supra, 296 F.2d at 924.

genuine interests for which the privilege is designed.[8] Nevertheless, considering these things and the record as a whole, the court finds that Mr. Kinoy has made no valid case for the claim of privilege. On the contrary, the testimony leads to the clear conviction that he knows his daughter's whereabouts as her parent, and not as her lawyer at all.

Mr. Kinoy acknowledged (Tr. 19) that his daughter "might well have" told him her whereabouts even if he were not her lawyer. But the record leaves no doubt that she "would have." The father-daughter relationship between them is in no way strained or unloving. They make no sharp separation in their conversations between legal and familial things. Most interestingly, when a concrete test was proposed as to what this daughter may tell her parents *qua* parents, Mr. Kinoy resisted and obstructed on varying grounds, none of which were meritorious. He reported that his wife and he are separated, but refused on grounds of marital privilege to say whether his wife knows Joanne's whereabouts. When it was suggested by the court that the wife be subpoenaed, and he was asked for her address, he at first refused to give even that. Directed to answer, he adhered for a while to his refusal, bringing us close to a regrettable occasion for a contempt adjudication. He finally relented and gave the address. The hearing was adjourned to the next day, so that Mrs. Kinoy could be brought in as a witness.

On the evening of the same day, however, counsel for Mr. Kinoy and the Assistant United States Attorney agreed that the burden of a compelled appearance by Mrs. Kinoy could be obviated. For, it was agreed, Mr. Kinoy was now prepared to testify that Mrs. Kinoy, who is not a lawyer, (1) knows the daughter's whereabouts, and (2) acquired this knowledge by a communication from her daughter. Upon this basis the government agreed to forego execution of the subpoena already issued.[9] The court was informed of the agreement by both sides.

The agreement was fulfilled. On the second day of our hearing Mr. Kinoy did in fact testify that his wife knows where her daughter is and has learned of this through a communication from the daughter.[10]

The court concludes, upon this record as a whole, that Mr. Kinoy's knowledge is likewise acquired from his parental role, not in any capacity as legal adviser. Cf. Modern Woodmen of America v. Watkins, 132 F.2d 352, 354 (5th Cir. 1942); United States v. United Shoe Machinery Corporation, 89 F.Supp. 357, 359–60, 361 (D.Mass.1950); McKnew v. Superior Court, 23 Cal.2d 68, 142 P.2d 1 (1943). He has "failed to meet the burden of establishing the essential predicate to invocation of the privilege," In re Bonanno, *supra*, 344 F.2d at 831. He has not shown that the fact about which the grand jury wishes to ask came to him (1) when legal advice was being sought by his daughter, dealing with him (2) as "a professional legal adviser in his capacity as such," (3) in a communication relating to that purpose, (4) made in confidence. See Unit-

8. Here, as elsewhere, the courts must undertake to see that "the privilege is neither to be unduly expanded nor to become a trap." United States v. Kovel, *supra*, 296 F.2d at 923.

9. Mr. Kinoy expressed a keen desire that no subpoena issue to compel testimony by his wife either in this proceeding or before the grand jury. The government, while not bound to do so, stated in court its willingness to respect that wish.

10. There are indications that other third parties who are not lawyers have very possibly been told by Joanne, in her father's presence, where she is living. Asked about this, Mr. Kinoy first said he believed it not to be the case. He said then he could not recall, adding, however, that it is "possible." At a minimum, the state of his recollection reflects a certain indifference until now to keeping the matter confidential within the sense and scope of the attorney-client privilege. See McCormick on Evidence 191 (1954).

ed States v. Kovel, *supra*, 296 F.2d at 921. Failing to meet those requisites, his assertion of the attorney-client privilege cannot be sustained.

▆ 3. To deny the claim of attorney-client privilege is not to erase or ignore the delicate and possibly painful stance of Mr. Kinoy as a father. Moving on to that, Mr. Kinoy proceeds from his claim as Joanne's lawyer to a claim as her father, and invokes a "parent-child privilege." But there is no such thing. All of us, whether as parents or children, may empathize over the imaginable prospect of being asked to incriminate those close to us. However, that is not necessarily the situation here,[11] and it would not in any event justify enforcement of the novel privilege now asserted.

It may be, of course, that a parent asked about possibly damaging things touching his child could invoke in good faith the privilege against incriminating himself. Such an occasion, should it arise, is one Mr. Kinoy is amply equipped to handle.

▆ 4. It is said next that Mr. Kinoy has been asked to tell the F.B.I. or the United States Attorney his daughter's whereabouts; that he has refused to do so; and that this renders unlawful the grand jury's use of compulsion to put the same question. There is nothing to this. The grand jury, our record shows, wants to know where Joanne is so that it can subpoena her because it has reason to believe she knows things relevant to its investigation. It is undisputed, and entirely sensible, that Mr. Kinoy has been invited to spare himself an appearance before the grand jury by telling the United States Attorney or the F.B.I. where Joanne can be found. Having refused to volunteer the information

sought by the grand jury, Mr. Kinoy has been subpoenaed. For his view that this is unlawful he gives neither reason nor authority. The court perceives none. The argument is rejected.

5. Mr. Kinoy points out he is counsel in United States v. Dellinger, et al., pending on appeal in the Seventh Circuit from the well-publicized convictions in what he labels "the Chicago Conspiracy Trial * * *." He says he has "primary responsibility for the brief," due January 8, 1971, and that he is "extremely occupied with those appeals."[12] His affidavit leaves the subject at that, but another attorney says in an affidavit that he has informed the Assistant United States Attorney having charge of this matter "that, in view of the apparent violation of the attorney-client privilege, the problem of the remoteness of the inquiry, and his refusal to agree to a postponement [until after January 8, 1971], the entire matter could be interpreted as a harassment of Professor Kinoy."[13] Based upon this somewhat indirectly stated conclusion, Mr. Kinoy now urges "harassment" as a ground for quashing the grand jury subpoena. The Assistant United States Attorney responsible for the proceeding denies under oath any purpose to harass.

▆ There is no occasion for an evidentiary hearing upon the formal "issue" thus presented. A subpoena over a month before the due date of even an enormous brief,[14] where the appearance demanded seems destined to be a short one, is far from any conceivably fatal oppression. The contention about harassment is on its face thin and unimpressive. If grand juries could be impeded in such circumstances by preliminary trials concerning their (or the prosecutor's) mo-

---

11. Questioned as a witness by counsel for Mr. Kinoy, the Assistant United States Attorney handling this matter (in a fashion, it may be noted, worthy of his Office's highest traditions) stated that Joanne Kinoy is not herself a "target" of the grand jury's inquiry.

12. Affidavit sworn December 17, 1970, pars. 1 and 5.

13. Affidavit of Peter Weiss, sworn December 17, 1970, p. 2.

14. The subpoena was served "by prearrangement" on December 10, 1970. Affidavit of William M. Kunstler, sworn December 17, 1970, par. 1.

tives, their subpoenas would become clumsy weapons indeed.

Grand juries could, to be sure, serve as engines of harassment. There may be cases where facts appear at the threshold sufficient to require advance exploration of that sort of charge. On the showing here, however, no such delaying course could be justified.

The motion to quash is denied. So ordered.