**UNITED STATES of America**

**v.**

**John DOE.**

**Mike Gravel, United States Senator, Intervenor, Appellant.**

**UNITED STATES of America, Appellant,**

**v.**

**John DOE.**

**Nos. 71–1331, 71–1332 and 71–1335.**

United States Court of Appeals, First Circuit.

Heard Nov. 10, 1971.

Decided Jan. 7, 1972.

On Rehearing Jan. 18, 1972.

David R. Nissen, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., and Warren P. Reese, Asst. U. S. Atty., were on brief, for the United States.

Robert Reinstein, Philadelphia, Pa., and Herbert O. Reid, Sr. with whom Charles L. Fishman, Washington, D. C., was on brief, for Mike Gravel, United States Senator.

Doris Peterson, Peter Weiss, James Reif, and Morton Stavis, New York City, on brief, for Leonard Rodberg, amicus curiae in case No. 71–1335.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

These cross appeals raise important questions as to the extent of the privilege afforded by the Speech or Debate clause of the Constitution. This clause, the separate and concluding part of Article I, Section 6, Clause 1, provides that ". . . for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place." The issues arise in the context of a motion to limit the testimony that can be presented to a federal grand jury. The facts are these.

A copy of classified Defense Department documents, now widely known as the Pentagon Papers, containing hitherto unpublished facts concerning the background and conduct of the Vietnam War, found itself, unauthorizedly, in the hands of Senator Gravel, the junior senator from Alaska. The Senator was Chairman of the Senate Subcommittee on Public Buildings and Grounds. He called a meeting of the subcommittee, read to it a summary of the high points, and then introduced the entire Papers, allegedly some 47 volumes and said to contain seven million words, as an exhibit. There-

after, he allegedly supplied a copy of the Papers to the Beacon Press, a Boston publishing house, owned by the Unitarian-Universalist Society, for publication.

These matters and the events preceding them have attracted the attention of a grand jury in the Massachusetts District. The court found, "The crimes being investigated by the grand jury include the retention of public property or records with intent to convert (18 U.S.C. § 641), the gathering and transmitting of national defense information (18 U.S.C. § 793), the concealment or removal of public records or documents (18 U.S.C. § 2071), and conspiracy to commit such offenses and to defraud the United States (18 U.S.C. § 371)." (Strictly, the court misused the word "public.")

Among other summoned witnesses were Leonard S. Rodberg, a legislative assistant to Senator Gravel, and Howard Webber, director of M. I. T. Press. Rodberg objected to testifying, on the ground of invasion of his First Amendment rights of freedom of association and freedom of the press, and in addition, on the ground that as a legislative assistant to the Senator, he is protected by the Speech or Debate clause. The Senator himself has not been called, and the Department of Justice has stated that it has no intention of calling him. The court, however, 332 F.Supp. 930, permitted the Senator to intervene in the proceedings for the purpose of arguing that his own privilege under the Speech or Debate clause requires that the subpoenas issued to Rodberg and Webber be quashed, and that a protective order be issued suppressing certain other testimony. The resulting order the Senator, as the present appellant, finds too limited, and the government, as cross-appellant, too broad.

## JURISDICTION

■ The government, correctly, points out that if the subpoena that was sought to be quashed was directed to intervenor, there could be no appeal from the refusal to quash unless he took the further step of refusing to comply, and

was adjudicated in contempt. Cobbledick v. United States, 1940, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783; United States v. Ryan, 1971, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85. Here, however, the subpoena was not addressed to intervenor, but to third parties, who could not be counted on to risk contempt in order to protect intervenor's constitutional rights. *See* United States v. Ryan, ante, at 533, 91 S.Ct. 1580. Hence he was "powerless to avert the mischief of the order" unless permitted to appeal it. Perlman v. United States, 1918, 247 U.S. 7, 13, 38 S.Ct. 417, 419, 62 L.Ed. 950. The government's effort to take the case outside the *Perlman* exception, by arguing that intervenor will not suffer irreparable injury if the grand jury hears the evidence, assumes the correctness of its claims that no injury is cognizable unless and until intervenor is indicted. *Perlman*, however, illustrates that, to the contrary, a court, in determining whether an intervenor will suffer irreparable injury unless allowed to appeal, should assume his claim to be correct. We hold, therefore, that the order denying intervenor's motion is appealable.

## THE ISSUES

The court's order, so far as presently material, provided as follows.

"(1) No witness before the grand jury currently investigating the release of the Pentagon Papers may be questioned about Senator Mike Gravel's conduct at a meeting of the Subcommittee on Public Buildings and Grounds on June 29, 1971 nor about things done by the Senator in preparation for and intimately related to said meeting.

"(2) Dr. Leonard S. Rodberg may not be questioned about his own actions on June 29, 1971 after having been engaged as a member of Senator Gravel's personal staff to the extent that they were taken at the Sen-

ator's direction either at a meeting of the Subcommittee on Public Buildings and Grounds or in preparation for and intimately related to said meeting."

This order was preceded by a comprehensive recitation of facts, some of which we do not repeat, and discussion of the legal principles. United States v. John Doe (In re Rodberg), D.C.Mass., 1971, 332 F.Supp. 930. By a subsequent order the court refused further relief, except for a brief temporary stay, which we extended.

The response of both parties is extreme. Intervenor's brief suggests that the entire inquiry is improper.

"There probably is no clearer case of the prostitution of the grand jury process than is daily evidenced [here]. . . . This Court is thus presented by the government with a flagrant misuse of the subpoena power of the grand jury . . . [by the executive]. This represents a fundamental perversion of the function of the grand jury. . . ."

The government does not make the rejoinder that intervenor's own action in disclosing documents which were, in his own words, "critical of Executive conduct in foreign affairs," had no conceivable relevance to the functions of the Subcommittee on Public Buildings and Grounds; a matter which would seem self-evident.[1] While recognizing that that claim would be (at least largely, see post) irrelevant, it does take the extreme position that while legislators may not be questioned "for" their speech or debate, in the sense of being held accountable, they may be freely questioned "about" them.

### "SPEECH OR DEBATE"—THE SCOPE OF THE PRIVILEGE

The areas in which intervenor objects to questioning are three—speech or debate itself, or publication; preparation, or pre-publication, and, finally, republi-

---

1. Nor does the government point out that intervenor, although relying elsewhere on the public's "right to know," (*see* n. 5, post) basically is seeking to block exposure of how he exposed what, in turn, the Executive did not wish to have exposed.

#### a) *Publication*

■■ For what he says or does on the floor of the Senate, or before the subcommittee, intervenor is concededly protected by an absolute privilege from all criminal and civil liability. *See* United States v. Johnson, 1966, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681; Tenney v. Brandhove, 1951, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019. It is equally clear that this protection extends to any written reports of the committee proceedings addressed to Congress, including material unspoken at the hearing but inserted directly into the record. *See* Kilbourne v. Thompson, 1880, 103 U.S. 168, 204, 26 L.Ed. 377; McGovern v. Martz, D.D.C., 1960, 182 F.Supp. 343, 347. The privilege protects against a claim of irrelevancy, *see* Cochran v. Couzens, 1930, 59 U.S.App.D.C. 374, 42 F.2d 783, 784, as well as of falsity and malice. The government would argue that intervenor could be questioned "about" his conduct for this very reason, drawing the analogy that one who is immune from prosecution cannot claim the protection of the Fifth Amendment.

■■ In our view this misconceives the scope and purpose of the Speech or Debate clause, which is not principally to protect the person and pocketbook of legislators, but, rather, is to ensure freedom of debate. United States v. Johnson, ante, 383 U.S. at 180–182, 86 S.Ct. 749. Intimidation of a legislator, harassment, embarrassment with the electorate, all may be achieved short of obtaining a criminal or civil judgment. *Cf.* United States v. Johnson, 4 Cir., 1964, 337 F.2d 180, 191, aff'd, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681. Since these consequences can flow from mere inquiry, the possibility of judicial inquiry could itself serve as an effective deterrent to speaking out against executive policy. *Id.* Further, although it seems to us relatively less important, the time required to respond to such an inquiry would be inconsistent with another purpose of the Speech or Debate clause, which is "to insure that legislators are not distracted from or hindered in the performance of their legislative tasks." Powell v. McCormack, 1969, 395 U.S. 486, 505, 89 S. Ct. 1944, 1955, 23 L.Ed.2d 491; *see* Tenney v. Brandhove, ante, 341 U.S. at 377, 71 S.Ct. 783. We cannot accept the government's distinction between questioned "for" and questioned "about." [2] Nor do we think that the place of questioning, whether it be before the grand jury or before a petit jury, determines its palatability. The legislator need not answer questions anywhere.

#### b) *Pre-publication*

■ Turning to the pre-publication period, we note that we are concerned not with whether a legislator may be protected from prosecution for illegal conduct in obtaining information for use in a congressional proceeding, but only with the extent to which the constitutional privilege bars grand jury questioning. Different considerations may well apply. Effective debate presupposes access to facts. *See generally* Cella, The Doctrine of Legislative Privilege of Freedom of Speech and Debate; Its Past, Present and Future as a Bar to Criminal Prosecutions in the Courts, 2 Suffolk L.Rev. 1, 36 (1968). Since the scope of the privilege should be as broad as is necessary to achieve its purpose of assuring full and free debate, *see* Stockdale v. Hansard, 1839, 9 Ad. & E. 2, 150, 112 Eng.Rep. 1112, 1169, we include therein inquiries which would restrict acquisition of information. It seems manifest that allowing a grand jury to question a senator about his sources

2. On the other hand, while we are discussing terminology, except insofar as his hyperbole quoted ante may so suggest, we do not believe intervenor contends that his constitutional protection against questioning means that the government cannot prove aliunde wrongful acts by others which, by implication, may bring his own conduct "into question." There could be no merit in such a claim.

would chill both the vigor with which legislators seek facts, and the willingness of potential sources to supply them. *Cf.* Caldwell v. United States, 9 Cir., 1970, 434 F.2d 1081, cert. granted 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109. Whatever the accommodation that must be made with respect to the public interest in prosecuting crime, *cf.* Dombrowski v. Eastland, 1967, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577, we cannot accept that it is to be drawn in favor of permitting direct inquiry of a legislator.[3] To what other persons this protection may extend we will consider later. All government action cannot be frozen in the name of chilling speech. *Cf.* United States v. O'Brien, 1968, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672.

### c) *Republication*

██ Intervenor in his appeal contends that the clause comprehends not only the delivery of a congressional speech and conduct antecedent thereto, but also conduct subsequent to the speech aimed at its wider dissemination, including private republication. Apart from republication such as in the news media or the Congressional Record, which is the

natural consequence of a speech and is necessarily protected, *see* McGovern v. Martz, ante, 182 F.Supp. at 347, no American court appears to have decided this question.[4] *But cf. id.*; Long v. Ansell, 1934, 63 U.S.App.D.C. 68, 69 F. 2d 386, 389, aff'd 293 U.S. 76, 55 S.Ct. 21, 79 L.Ed. 208. In urging us to resolve it in his favor, intervenor acknowledges that it will not affect his freedom to speak, since the speech has already been made, but argues that republication is essential to the "due functioning of the legislative process," United States v. Johnson, ante, 383 U.S. at 172, 86 S.Ct. at 751 and is "generally done" by members of Congress.[5] Kilbourne v. Thompson, ante, 103 U.S. at 204, 26 L.Ed. 377. *See also* Stockdale v. Hansard, ante, at 150, 1169. The difficulty is that the term "legislative process" is no more self-defining than "Speech or Debate." The language and history of the Speech or Debate clause is a surer guide to the scope of the privilege than catch phrases, and we find in both a focus upon matters occurring in the course of deliberation. This had been the English concept upon which our privilege had been patterned.[6]

3. In New York Times v. United States, 1971, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822, the Court accommodated related free speech interests in holding that the newspaper's conduct could not be enjoined, although, as pointed out in Mr. Justice White's concurring opinion, it may have been criminal. *Id.*, at 730–741, 91 S.Ct. 2140.

4. We put to one side cases refusing an injunction, as involving different considerations. *See* Hentoff v. Ichord, D.D.C., 1970, 318 F.Supp. 1175; Methodist Federation for Social Action v. Eastland, D.D.C., 1956, 141 F.Supp. 729; *cf.* New York Times v. United States, n. 3 ante. In the more common situation, it has long been settled that the publication of defamation, although actionable, may not be enjoined. *E. g.*, Crosby v. Bradstreet Co., 2 Cir., 1963, 312 F.2d 483, 485, cert. denied 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412; Kidd v. Horry, C.C.E.D.Pa., 1886, 28 F. 773.

5. "The Framers presuppose[d] the maximum amount of communication between the citizens and their elected representatives."

"The people must be informed fully of the workings of government."

"The heart of representative democracy is the communicative process between the people and their agents in government."

"Informing the electorate is a 'legislative act' since it is clearly 'related to the due functioning of the legislative process.' United States v. Johnson, supra [383 U.S.] at 172, [86 S.Ct. 749]. In fact, it is not exaggeration to say that direct communication between a Member of Congress and the electorate is an essential bedrock of the legislative process, for it insures that the people will inform *him and his colleagues* [sic] of their well-considered views on pending and future legislation—an indispensable prerequisite for each Congressman deciding how to cast his own vote."

6. "[I]t may be reasonably inferred that the framers of the Constitution meant the same thing by the use of language borrowed from that source." Kilbourne v. Thompson, ante, 103 U.S. at 202.

Two English cases, decided shortly after the enactment of the American constitution, held that the parliamentary privilege did not immunize members from civil liability for libels contained in privately published reproductions of their partliamentary speeches. Rex v. Creevey, 1813, 1 Maule & Selwyn 273; Rex v. Lord Abington, 1795, 1 Esp. N. P. Cases 228. See generally T. E. May, Treaties on the Law, Privileges, Proceedings and Usage of Parliament 48–66 (16th ed. E. Fellowes & T. G. B. Cocks 1957); C. F. Wittke, The History of English Parliamentary Privilege 23–32 (1921). Our courts have expanded the privilege beyond the act of debating within Congress a proposal before it only when necessary to prevent indirect impairment of such deliberations. *See* Kilbourne v. Thompson, ante; Coffin v. Coffin, 1808, 4 Tyng (Mass.) 1.

▆▆▆ We do not find private republication within that category. The fact that it may be customarily done by members of Congress is not the answer.[7] Only those acts by which a congressman ordinarily expresses to the House his views on matters before it come within the Supreme Court's extension of the privilege to "things generally done . . . *in relation to the business before [Congress]*." Kilbourne v. Thompson, ante, 103 U.S. at 204 (Emphasis supplied)

▆▆▆ Intervenor's argument that communicating with the electorate is essential to effective deliberation because it elicits responses to guide his legislative decisions and because it helps to put pressure upon other legislators, (n. 5, ante, ¶4) proves too much. If accepted, it would bring within the privilege not only republished congressional speech, but speeches delivered anywhere. But even restricted to repeating what has once been said in a legislative context, the consequences of an unlimited absolute privilege would be staggering. We do not believe intervenor has struck such gold in a field previously thought to be barren.[8] The fact that some repetition may be inevitable does not mean that there should be immunity to add to it. *Cf.* Murray v. Brancato, 1943, 290 N.Y. 52, 48 N.E.2d 257 (no privilege for judge to circulate privately a calumnious opinion); see Annot., 146 ALR 913. We will not hold that there is a constitutional privilege to print privately what, we must assume for present purposes, were classified documents simply because intervenor had first disclosed them to a Senate subcommittee whose function was totally unrelated thereto.[9]

▆▆▆ The fact that republication is not within the constitutional privilege does not exclude consideration of other protection. To the extent that a congressman has responsibility to inform his constituents, his performance of that responsibility may be protected from liability by a common law privilege, as is an executive official's. A news release about the speech may well be as protected as the speech itself. *Cf.* Barr v. Matteo, 1959, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (absolute immunity giv-

7. *Cf.* United States v. Johnson, ante, 383 U.S. at 172, 86 S.Ct. 749. There the Court observed that an attempt to influence the Department of Justice in favor of a constituent was unprotected, yet assisting constituents is just as customary a function as communicating with them. See generally V. O. Key, Politics, Parties and Pressure Groups (3d ed. 1952); R. Davidson, The Role of the Congressman 99 (1969).

8. Those with long memories may recall the frequent, but unaccepted, challenges to a former junior senator from Wisconsin to repeat outside the walls of Congress the calumnies he often expressed within their protection. If intervenor is correct, we would see no reason for distinguishing between the types of legislative speech that could be repeated.

9. Examples might be multiplied. If an unpublished manuscript was stolen by parties unknown and subsequently was introduced into the records of a Congressional committee, could it be thought that the common law copyright was lost by reason of the Speech or Debate clause? Or, in the case of a published work, that the statutory copyright would thereby be extinguished?

en executive officer for libel contained in news release). How far this immunity should go will depend upon the facts of the particular case. An even more difficult question is whether the measure of the grand jury's right to make personal inquiry of the legislator follows the immunity. Arguably, it may go further, or not so far. Because we do not consider this a matter of present substantial importance, and partly because the court is not in total agreement, we presently resolve it, without binding ourselves for future purposes, if the matter is more sharply put, that he may not be questioned at all as to republication.[10] We do not, of course, mean by this that we are ruling, even tentatively, on the limits of criminal liability.

## WITNESSES PRECLUDED

It may be wondered why, since under Cobbledick v. United States, ante, until he has been held in contempt we apparently have no jurisdiction to advise intervenor as to the measure of his immunity from testifying, we have nevertheless been answering that question. The reason is that such answer is a necessary condition to passing upon the immunity of others, such as Rodberg, who intervenor claims in this appeal to come under his legislative protection. We now turn to this.

### a) *Legislative Aides*

 It is not only accepted practice, but, we would think indispensable, for a legislator to have personal aides in whom he reposes total confidence. This relationship could not exist unless, during the course of his employment, the aide and the legislator were treated as one. To the extent, if any, that there might be exceptions, again, for present purposes, we do not inquire. We note, however, that this synonymity is founded upon the

relationship, not on the fact of employment. Rodberg, for example, is not protected from inquiry as to events unconnected with intervenor at the time of occurrence. We reject intervenor's contention that the fact of hiring insulated him from all inquiry as to prior events related to the Papers, but not to intervenor. *See* Heine v. Raus, 4 Cir., 1968, 399 F.2d 785, 790–791.

### b) *Third Parties*

 United States v. Johnson, ante, holds that any person who dealt with a legislator with respect to speech or debate can not be inquired of if the object is to attack the legislator's motives in speaking. Specifically, it could not be shown that the defendant's speech was written by a constituent, or that the defendant was paid to deliver it. The Court did not suggest that a legislator was free in all respects from criminal prosecution. *But see id.*, 383 U.S. at 185, 86 S.Ct. 749. Indeed, were it to be thought so, one need only turn to the other portions of the Clause, which regulates, procedurally, criminal trials. With respect to third persons, provided that the principles of *Johnson* are observed, we can see no reason for them to be free of inquiry as to their own conduct regarding the Pentagon Papers, including their dealing with intervenor or his aides. We have already spoken as to Rodberg, pre-employment. At the other end, so far as intervenor's privilege is concerned, we hold that no immunity was conferred upon Beacon Press simply because, if he did, intervenor delivered the Papers to it for private publication. Indeed, we would hold, if his appeal can be thought to raise that question,[11] that whatever Beacon Press did is freely inquirable even to the extent, if any (it has not presently been suggested), that it may have made payments to intervenor

---

10. In part we do this because we propose, so far as possible, to make a practicable decision that avoids unnecessary or doubtful points that might burden the Supreme Court.

11. We take it that intervenor believes it does, in the light of a contempt proceeding he instituted when he erroneously believed the United States Attorney was using a subpoena to examine the Beacon Press' bank records during the processing of this appeal.

or others in connection with the Papers subsequent to their introduction into the subcommittee records. Payment for delivering a copy, by a post-speech agreement, is not comparable to a payment for initially delivering the speech. Similarly, the district court's refusal to include Webber in its order was correct.

## PROCEDURE

 Intervenor has presented us with a request covering the type of witnesses he believes should be excluded altogether, and an elaborate procedure for the court to employ as to testimony the government proposes to introduce through other witnesses. Much of this request goes by the board with our rejection of some of his basic premises. As to the rest we find such procedure unnecessarily cumbersome, and suggest a simpler solution. Intervenor may supply a list of his personal aides, and the dates of their employment. Upon the court's being satisfied as to the correctness of the list it shall order that no questions be asked of any of them relating to the Pentagon Papers or to intervenor's legislative activities during the period of their employment. It shall further order that no questions be asked of any other witness as to communications with intervenor regarding legislative activities, including the furnishing of information, or with his aides during such periods, directed to intervenor's motives or purpose in introducing the Papers into the subcommittee records. We believe the contempt power of the court will be a sufficient guarantee of enforcement without the need of adopting intervenor's extraordinary request that every question be submitted to him for approval before it is asked.

Except to the extent that it is modified herein the order of the district court is affirmed. Even though intervenor has essentially lost his appeal, we do not believe this an appropriate case in which to award costs.

## ON PETITION FOR REHEARING, ETC.

ALDRICH, Chief Judge.

 Intervenor has filed a petition for "reconsideration." The word is accurately used; intervenor is arguing the same points he made before. His proffered excuse is that the "expedited schedule . . . severely constricted . . . research." If this was so, it is the first we have heard of it. No pre-argument protest of lack of time was raised; no protest was made at the argument; no request was made for permission to file a further brief, either then, or during the eight weeks we had the matter under advisement. Nor should it be forgotten that petitioner sought intervention in August 1971. We would have thought he had ample opportunity to do his research. F.R.A.P. 40 was not promulgated as a crutch for dilatory counsel, Cross Baking Co. v. NLRB, 1 Cir., 12/30/71, 453 F.2d 1346, nor, in the absence of a demonstrable mistake, to permit reargument of the same matters.

 We pass this, in view of the importance of the case. More difficult to overlook is the fact that, with our views and reasoning now fully before him, intervenor, in rearguing the republication issue, fails to address himself to our specific "attempts to reconcile fundamentally antagonistic social policies" (Barr v. Matteo, 1959, 360 U.S. 564, 576, 79 S.Ct. 1335, 1342, 3 L.Ed.2d 1434). Further generalities about "legislative activity in the classic and historic sense" do not indicate to us why we are wrong in drawing a distinction between normal and customary republication of a speech in Congress and republishing privately all or part of 47 volumes of, we must presently assume, lawfully classified documents through the device of filing them as exhibits to the records of a subcommittee to which they have no conceivable concern. In repeating the familiar arguments why he should be absolutely protected with respect to introducing the ex-

hibits before the subcommittee—a matter no one questions—and talking broadly about his duty to inform the public, intervenor does not answer our analysis of what should be the subsequent limits of protection.

The petition for reconsideration is denied.

 Alternatively, petitioner seeks clarification of our order. We do not, however, understand how he can think the order permits inquiry of third persons directed to his motives. We see no need of clarification here. His further inquiry, whether questions could be asked of third parties about "preparation for the hearing if that *relates* to his motives for holding it," (emphasis suppl.) perhaps calls for comment. During oral argument we posed a hypothetical, not repeated in our opinion, but to which intervenor now returns. Suppose that the President's private diary is stolen, and thereafter a Congressman introduces it into the legislative record. Petitioner's present brief suggest that since this would be an exercise of "the informing function of exposing Executive behavior," the only answer he would have to make would be to the "House and . . . the people," unless he participated in the theft. His point is put best in the form that preparation is part of speech, and that if inquiry may be made even as to third parties as to the sources, he will be inhibited. Here it seems to us, some adjustment of competing interests must be made. We believe that if a document shown to be improperly at large is sought to be traced, it may be traced by inquiry of third parties even if the effect may be to lead to a legislator. In United States v. Johnson, 1966, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681, the prosecution was barred from questioning third parties about their role in preparing a congressional speech only because the questions were directed to proving that the speech itself was part of a criminal conspiracy. This should not mean that all illegal activity is insulated from inquiry, apart from prosecution, simply because it could be characterized as preparation for a speech. The introduction of the document into the subcommittee records, like Thetis' immersion of Achilles, cannot effect universal protection.

Intervenor has a valid point with respect to the portion of the order relating to Rodberg. This is clarified by inserting after the phrase "his own actions" the words "in the broadest sense, including observations and communications, oral or written, by or to him, or coming to his attention."