**In re GRAND JURY SUBPOENA DATED JANUARY 4, 1984.**

**No. CV–84–0336.**

United States District Court,
E.D. New York.

April 5, 1984.

Washington Square Legal Services, Inc. by James A. Cohen, New York City, for witness.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Max Sayah, Asst. U.S. Atty., Brooklyn, N.Y., for Government.

MEMORANDUM and ORDER

WEINSTEIN, Chief Judge:

■ In this case of apparent first impression, Mr. Mario Brajuha a graduate student at the State University, Stoneybrook, Long Island, moves to quash a grand jury subpoena directing him to produce a journal he kept in preparation for his doctoral dissertation. Although a

scholar does not have an absolute right to withhold a journal of his conversations with informants and of his impressions, he has a limited federal common law privilege to do so. Because the government has not shown any substantial need for the journal, the motion to quash must be granted.

## I. FACTS

Mr. Brajuha is a candidate for a doctorate. He is preparing a dissertation on "The sociology of the American restaurant." His research led him to work as a waiter in "Le Restaurant" on Long Island from July 1982 until March 1983. While so employed, he kept a record of his observations and comments. He promised confidentiality to those of his fellow workers who acted as informants.

In March 1983, a suspicious fire broke out at Le Restaurant. The federal grand jury, convened to investigate the incident and other matters, subpoenaed Mr. Brajuha to testify and to produce his journal. Mr. Brajuha apparently testified fully about his direct observations of events at the restaurant. The only issue before this court is whether he must produce the journal for grand jury inspection.

## II. LAW

■ In *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court held that a reporter does not have an absolute First Amendment right to refuse to appear before a grand jury. By analogy this ruling applies to any scholar collecting data with a view to publication. Nevertheless, as Justice Powell stated in his concurring opinion in *Branzburg*, the writer's needs should not be ignored, but must be balanced against those of the courts:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the

tried and traditional way of adjudicating such questions.

*Id.* at 710, 92 S.Ct. at 2671.

Following Justice Powell's standard, lower courts have applied a balancing test and have held that journalists have a qualified privilege not to reveal documents or confidential sources. *See, e.g., Baker v. F & F Investment*, 470 F.2d 778, 780–83 (2d Cir. 1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *United States v. Burke*, 700 F.2d 70, 76–77 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *United States v. Cuthbertson*, 630 F.2d 139, 146–49 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433, 436–38 (10th Cir.1977). *See also In re Roche*, 448 U.S. 1312, 1315, 101 S.Ct. 4, 6, 65 L.Ed.2d 1103 (Brennan, Circuit Justice 1980: "I do not believe that the court has foreclosed news reporters from resisting a subpoena on First Amendment grounds."). *Cf. Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78 (E.D.N.Y.1975) (policy protecting news reporter's sources supports limiting discovery in some cases). *But see In re Farber*, 78 N.J. 259, 394 A.2d 330, 334 (1978), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978) (relying on *Branzburg* in holding that "no weighing or balancing of societal interests" is required to determine that a journalist has no privilege to withhold information from a grand jury); *Brown v. Virginia*, 214 Va. 755, 204 S.E.2d 429, 431 (1974), *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974) (journalist has privilege related to the First Amendment "which must yield to the government's right to investigate and indict by grand jury").

Some courts have relied exclusively on the First Amendment, *see, e.g., United States v. Burke*, 700 F.2d 70 (2d Cir.1983), while others have relied on Rule 501 of the Federal Rules of Evidence, *see, e.g., Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979); *Lora v. Board of Education*, 74 F.R.D. 565, 577 (E.D.N.Y.1977), or state practice, *see, e.g., Apicella v. McNeil Lab-*

*oratories, Inc.*, 66 F.R.D. 78, 83–84 (E.D.N.Y.1975). The results have been the same.

■ In each instance, the court balances the government's or opposing party's need for the material against the First Amendment and analogous interests implicated in the particular case. In the instant case the interests to be balanced are the public interest in affording a serious scholar the opportunity to maintain the confidentiality of his research notes against the interests of the government in having access to whatever information may be contained in those notes.

■ There is a strong public interest in fostering the confidentiality of a journalist's work materials and sources in order to maintain the free flow of information to the public. *Cf., e.g., United States v. Burke*, 700 F.2d 70, 76–77 (2d Cir.1983) (reporter); *United States v. Cuthbertson*, 630 F.2d 139, 146–49 (3d Cir.1980) ("the compelled production of a reporter's resource materials can constitute a significant intrusion into the news gathering and editorial process"); *Baker v. F & F Investment*, 470 F.2d 778, 782 (2d Cir.1972) ("Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information.").

Policies underlying a journalist's limited privilege also support a similar limited privilege for a researcher preparing a scholarly work. Compelled production of a researcher's notes may inhibit prospective and actual sources of information, thereby obstructing the flow of information to the researcher, and through him or her, the public. *But cf. United States v. Doe*, 460 F.2d 328, 333–34 (1st Cir.1972), *cert. denied*, 411 U.S. 909, 93 S.Ct. 1527, 36 L.Ed.2d 199 (1973) (political scientist who conducted classified Defense Department study); *United States v. IBM Corp.*, 83 F.R.D. 92, 95 (S.D.N.Y. 1979) (basis for testimony of expert witness); *United States v. Doe*, 460 F.2d 328, 334 (1st Cir.1972) (communications among scholars).

The intrusion presented by a grand jury poring over Mr. Brajuha's entire journal is substantial. *See Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1274–77 (7th Cir.1982) (affirming district court refusal to enforce administrative subpoena calling for researchers to turn over "virtually every scrap of paper and every mechanical or electrical recording" made during studies on the grounds that the subpoena presented substantial intrusion into academic freedom and threatened to chill First Amendment rights). We can assume that a young scholar entertains a number of hypotheses that he or she ultimately may reject. It is undesirable to inhibit intellectual speculation by the threat of ridicule or misunderstanding of total strangers without a showing of overriding necessity. First Amendment protections for academic freedom, *see Minnesota State Board v. Knight*, ——— U.S. ———, 104 S.Ct. 1058, 1067, 79 L.Ed.2d 299 (1984); *Sweezy v. New Hampshire*, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957); *Gray v. Board of Higher Education*, 692 F.2d 901 (2d Cir.1982); *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1274–77 (7th Cir.1982), counsel against routinely requiring a researcher to reveal his or her research notes. Serious scholars are entitled to no less protection than journalists.

Affording social scientists protected freedom is essential if we are to understand how our own and other societies operate. Recognized by cultural anthropologists since at least the turn of the century as a basic tool, fieldwork is used widely in other disciplines, particularly sociology and political science. In order to work effectively researchers must record observations, communications and personal reactions contemporaneously and accurately.

Thus fieldnotes and diaries have been treated by professionals as confidential for what Professor John Lofland, Professor and Chair, Committee on Professional Ethics, American Sociological Association, has termed "ethical, strategic and analytic" reasons. In a report filed with the court dated February 24, 1984, and uncontroverted by the parties, he writes:

At the level of sheer civility, indeed, it is rankly ungracious to expose to public view personally identified and inconvenient facts on people who have trusted one enough to provide such facts! Strategically, fieldwork itself would become for all practical purposes impossible if fieldworkers routinely aired their raw data—their fieldnotes—without protecting the people studied. Quite simply, no one would trust them. Analytically, fieldworkers in particular and social scientists in general are *not* muckrakers or investigative reporters (as important as these roles are). Their goal, as researchers, is not moral judgment or social change, but *understanding*. Concealment of specific identities helps everyone focus on whatever generic topic may be at issue, avoiding deflection into personalistic matters.

Resting on the above considerations, "raw" fieldnotes are simply never published by fieldworkers or otherwise exposed to public view. Instead, they are subjected to a process of analysis in which materials are arranged in terms of analytic questions and fieldnote data and extracts employed in this process are carefully scrutinized for violations of anonymity and confidentiality. Names of places and people are routinely changed and locales are obscured. Further, even fieldnotes used for the purpose of *teaching* fieldwork to trainees are carefully selected and edited in these terms. (There is, however, one circumstance in which fieldnotes are not held to be absolutely confidential: a second fieldworker working on the same setting as a first investigator has a presumptive right to inspect at least parts of the first fieldworker's fieldnotes. Both, nonetheless, are bound by the same rule of confidentiality.)

(Emphasis in original.)

Academic organizations consistently have emphasized the need for confidentiality in research work. For example, in a joint amicus brief of the American Anthropological Association, American Political Science Association and American Sociological Association filed in *Popkin v. United States, cert. denied,* 411 U.S. 909, 93 S.Ct. 1527, 36 L.Ed.2d 199 (1973), it was noted:

Scholars contribute information essential to the society and to the policy-making function of the government. For example, scholars have conducted research sponsored by a variety of government and private agencies in areas such as crime, civil disorder, pornography, health care, violence, immigration, population control, conduct and administration of elections, and the use of drugs. In many cases, researchers have uncovered information vital to the understanding of these problems which would not have been obtained had their sources not believed that the researchers could safely assure them of confidentiality. Such information is clearly necessary for the public interest in general and for the informed formation of national policy in particular.

The American Anthropological Association's Principles of Professional Responsibility provide that sources have a right to remain anonymous and that anthropologists should do everything within their powers to protect the privacy of the people being studied. Sociologists and political scientists are equally concerned that their sources be protected.

Brief in support of petition for writ of certiorari at 5. An American Civil Liberties Union policy statement reiterates the necessity for confidentiality in research:

The First Amendment privilege should protect researchers engaged in gathering, writing, editing and presenting materials for publication and other dissemination, when obtained under promise of confidentiality from individual or group respondents. The term researchers should include private persons, academic or research personnel of municipal, state and federal educational institutions, and those employees of the government conducting academic research projects involving individual respondents. This definition does not apply to the regular collection and distribution of information by government officials otherwise open to

public access under freedom of information laws.

Such persons shall not be compelled to disclose sources of material or any materials obtained in confidence, to any state or federal governmental agency, investigating committee, grand jury or court except that a court having jurisdiction of a criminal action or proceeding may, at the instance of a defendant, and after appropriate notice and hearing, direct such disclosure if it finds it to be essential for the protection of a substantial right of such defendant and provided the information cannot be obtained elsewhere.

Policy number 67 of June 1973. Finally, the Revised Code of Ethics of the American Sociological Association provides that:

Confidential information provided by research participants must be treated as such by sociologists, even when this information enjoys no legal protection or privilege and legal force is applied.

American Sociological Association, *Revised Code of Ethics*, 10 Footnotes 9–10, § I.E. 5 (March 1982).

Against societal interests in fostering scholarly research, must be balanced the public interest in obtaining information about possible criminal activities through the grand jury process. This public interest is strong and often compelling. *See Branzburg v. Hayes*, 408 U.S. 665, 686–88, 92 S.Ct. 2646, 2659–60, 33 L.Ed.2d 626 (1972). In this case, Mr. Brajuha appeared before the grand jury and testified to what he saw and heard while working at the restaurant. *Cf. United States v. Doe*, 332 F.Supp. 938 (D.Mass.1971). There is no showing of any substantial government need to obtain his journal in order to supplement this testimony. *See Branzburg v. Hayes*, 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring: "[I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash."). Since the witness has testified, the subpoena for his journal is unnecessarily intrusive.

If a criminal indictment and trial grow out of the grand jury investigation, the balance struck between protection and production of the journal may well be different. For example, should Mr. Brajuha testify at a trial, the defendant may need the journal in order to be able to effectively cross-examine him. *See United States v. Nixon*, 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974); *In re Farber*, 78 N.J. 259, 394 A.2d 330, 336–67, *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978) (sixth amendment right to cross-examine overrides state reporter's shield law). At that point an *in camera* inspection or other inquiry may be appropriate in connection with a specific focused need for information. This issue is one for the trial judge should the matter ever come to trial.

The subpoena is quashed.